UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| BETTY SUSAN JORDON, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | 2:16-CV-00322 |
| | ) | |
| vs. | ) | |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

This matter is before the United States Magistrate Judge under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. Plaintiff's Disability Insurance Benefits application under the Social Security Act, Title II (the "Act") was denied after a hearing before an Administrative Law Judge ("ALJ"). This action is for judicial review of the Commissioner's final decision per 42 U.S.C. § 405(g). Plaintiff filed a Motion for Judgment on the Pleadings [Doc. 13] and Defendant filed a Motion for Summary Judgment [Doc. 15].

**I.     APPLICABLE LAW – STANDARD OF REVIEW**

A review of the Commissioner's findings is narrow. The Court is confined to determining (1) whether substantial evidence supported the factual findings of the ALJ and (2) whether the Commissioner conformed with the relevant legal standards. 42 U.S.C. § 405(g); *see Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). "Substantial evidence" is evidence that is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact. *LeMaster v. Sec'y of Health & Humans Servs.*, 802 F.2d 839, 841 (6th Cir. 1986). A Court may not try the case *de novo*, resolve conflicts

1

in the evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the Court were to resolve factual issues differently, the Commissioner's decision must stand if substantial evidence supports it. *Listenbee v. Sec'y of Health & Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). But, a decision supported by substantial evidence "will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007). The Court may consider any evidence in the record regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d. 528, 535 (6th Cir. 2001).

A claimant must be under a "disability" as defined by the Act to be eligible for benefits. "Disability" includes physical and mental impairments that are "medically determinable" and so severe as to prevent the claimant from (1) performing her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. 42 U.S.C. § 423(a).

A five-step sequential evaluation applies in disability determinations. 20 C.F.R. § 404.1520. Review ends with a dispositive finding at any step. *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The complete review poses five questions:

1. Has the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the "Listings"), 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's [Residual Functional Capacity], can he or she perform his or her past relevant work?

5. Assuming the claimant can no longer perform his or her past relevant work — and also considering the claimant's age, education, past work experience, and RFC — do significant numbers of other jobs exist in the national economy which the claimant can perform?

20 C.F.R. § 404.1520(a)(4).

A claimant has the burden to establish an entitlement to benefits by proving the existence of a disability under 42 U.S.C. §§ 423(d)(1)(A). *See Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). The Commissioner has the burden to establish the claimant's ability to work at step five. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## II.    RELEVANT FACTS AND PROCEDURAL OVERVIEW

### A.    Procedural History

Betty Susan Jordon ("Jordon") was a person of advanced age at the time of her application for Disability Insurance Benefits. 20 C.F.R. § 404.1563. She alleged an onset date of June 15, 2013, but has an active insured status through December 2018. (Doc. 7, Transcript p. 11, 13) (reference to "Tr" and the page denote the administrative record). She alleged several impairments she believes to be disabling.

Jordon's claims were initially denied in January 2014 and upon reconsideration in May 2014. (Tr. 11). An ALJ conducted a hearing on August 3, 2015. Jordon and a vocational expert testified. (Tr. 27-45). The ALJ followed the five-step analysis in evaluating the claims and found several of Jordon's alleged impairments to be medically determinable. These conditions included degenerative disc disease, arthralgias, diabetes, hypertension, anxiety and depression. (Tr. 13). Jordon also alleged she suffered from fibromyalgia, but the ALJ did not find this to be a medically determinable impairment. (Tr. 13).

Ultimately, the ALJ made the dispositive finding that Jordon's impairments, or a combination thereof, were not severe under step two of the analysis. This decision concluded the process and resulted in a determination Jordon was not disabled. The findings were as follows:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2018;

2. The claimant has not engaged in substantial gainful activity since June 15, 2013, the alleged onset date (20 CFR 404.1571 *et seq*.);

3. The claimant has the following medically determinable impairments: degenerative disc disease, arthralgias, diabetes, hypertension, anxiety and depression. (20 CFR 404.1521 *et seq.*);

4. The claimant does not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant does not have a severe impairment or combination of impairments (20 CFR 404.1521 *et seq.*);

5. The claimant has not been under a disability, as defined in the Social Security Act, from June 15, 2013, through the date of this decision (20 CFR 404.1520(c)).

(Tr. 40-51).[1] The Appeals Council denied Plaintiff's review request. (Tr. 1).

**B. Evidence in the Record**

The ALJ summarized the evidence. (Tr. 13-19). Jordon's brief reviews the record evidence [Doc. 14, pp. 3-11] and the Commissioner's brief does likewise [Doc. 16, pp. 3-11]. The transcript contains reports from one treating provider regarding her mental conditions (Tr. 374-75, 421-22, 499-503). State agency reviewers also reviewed and opined about Jordon's physical and mental conditions. (Tr. 46-56, 60-72). Reference to the evidence is only set forth as necessary.

**III. ANALYSIS**

Jordon asserts two errors. First, she urges the finding that she does not have a severe mental impairment is not supported by substantial evidence. Next, she claims the ALJ failed to properly evaluate and address evidence demonstrating that fibromyalgia is a medically determinable impairment from which she suffers under Social Security Ruling ("SSR") 12-2p. The Commissioner opposes the motion and seeks summary judgment on the basis that substantial

---

[1] A discussion follows many of the findings. Such discussion is not repeated here unless necessary.

evidence supports the Decision.

A. **Determination Mental Impairment Not Severe**

A range of sources provide guidance for determining whether a claimant has demonstrated an allegedly disabling impairment is severe.

First, the Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or which has lasted order can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Subsections (d)(2)(A) and (B) provide:

> (A) An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such works exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . .
>
> (B) In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairments could be the basis of eligibility under this section, the Commissioner . . . shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity. . ..

The regulations also require impairments to be severe. 20 C.F.R. § 404.1520(a)(4)(ii). If a person's impairment or combination of impairments does not significantly limit the physical or mental ability to do basic work activities, a severe impairment will not be found and the person is not disabled. 20 C.F.R. § 404.1520(c). Severity of impairments and basic work activities are further discussed in 20 C.F.R. § 404.1521:

> When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include—
>
> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
>
> (2) Capacities for seeing, hearing, and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

The Sixth Circuit has construed the two aforementioned regulations as a *de minimis* hurdle in the disability determination process. *Murphy v. Secretary of Health and Human Services,* 801 F.2d 182, 185 (6th Cir.1986); *Salmi v. Secretary of Health and Human Services,* 774 F.2d 685, 690–92 (6th Cir.1985); *Farris v. Secretary of Health and Human Services,* 773 F.2d 85, 89–90 (6th Cir.1985). Per this *de minimis* view, "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Farris,* 773 F.2d at 90.

Evaluation of symptoms and pain factors into the analysis of severity. 20 C.F.R. § 404.1528. Symptoms and pain and the extent to which they can reasonably be accepted as consistent with objective medical evidence are considered. Objective medical evidence includes statements as to symptoms and pain, although statements alone will not establish disability. *Id.*

Further, Social Security Ruling 85-2 has been issued to guide decisions as to impairment severity and provides in pertinent part:

> Inherent in a finding of a medically not severe impairment or combination of impairments is the conclusion that the individual's ability to engage in SGA [substantial gainful activity] is not seriously affected. Before this conclusion can be reached, however, an evaluation of the effects of the impairment(s) on the person's ability to do basic work activities must be made. A determination that an impairment(s) is not severe requires a careful evaluation of the medical findings which describe the impairment(s) and an informed judgment about its (their) limiting effects on the individual's physical and mental ability(ies) to perform basic work activities; thus, an assessment of function is inherent in the medical evaluation process itself. At the second step of sequential evaluation, then, medical evidence

alone is evaluated in order to assess the effects of the impairment(s) on ability to do basic work activities. If this assessment shows the individual to have the physical and mental ability(ies) necessary to perform such activities, no evaluation of past work (or of age, education, work experience) is needed. Rather, it is reasonable to conclude, based on the minimal impact of the impairment(s), that the individual is capable of engaging in SGA.

SSR 85-28, 1985 WL 56856 (1985).

Finally, the claimant bears the burden of showing she has a severe impairment or a combination of severe impairments. *See Bowen v. Yuckert,* 482 U.S. 137, 146 n. 5 (1987).

Following a review of the foregoing guidance and the record, the Court concurs with the ALJ's determination that Jordon's mental impairments are not severe and finds that substantial evidence exists to support the determination as explained herein.[2]

Jordon testified at the outset of the hearing that she was employed part-time by a healthcare corporation to conduct biometric or health screenings at a rate of $25 per hour. (Tr. 29). When the ALJ asked Jordon why she was not employed full-time, Jordon advised that her position was not available full-time. She then admitted that if the position were available full-time, she would work full-time. (Tr. 29). She explained her shifts last for five hours and that she has had to travel for the job, including once driving 100 miles and staying overnight. (Tr. 33, 35-56).

The fact Jordon was working part-time at the time of the hearing points to an absence of any severe impairment, whether mental or physical; her ready willingness to work full-time in the same job confirms the lack of severity. One does not unhesitatingly confirm readiness to take on full-time employment if one is truly unable to do so or has an abnormality that affects work ability beyond a minimal impact. *See Farris,* 773 F.2d at 90. Jordon's work pursuits and testimony demonstrate she retains the capacity to complete basic work activities and belie the alleged

---

[2] Except with regard to her claim regarding the ALJ's treatment of fibromyalgia, Plaintiff does not allege that the ALJ erred in finding that her alleged physical impairments were not severe.

inability to engage in any substantial gainful activity by reason of a medically determinable impairment. Put simply, Jordon's own testimony constitutes substantial evidence supporting the determination that her mental impairments are not severe.

Jordon's activities of daily living further support this conclusion. Her activities include preparation of meals, household chores, caring for her dogs, driving alone, shopping, reading, watching television, paying bills and managing finances, crafting, and crocheting. (Tr. 165-166, 195-99, 218), She also spends "many hours each week" with her cousin doing various activities. (Tr. 198). Given this range of activities, the ALJ found Jordon's claims as to her symptoms and pain, along with her professed limitations, were not entirely credible. The Court concurs.

Even without Jordon's admission and evidence of her activities, her mental health records and the conflicting opinions of her treating provider[3] undermine the existence of a severe impairment arising from depression and anxiety. Jordon began seeing psychiatrist Eric Moffett in March 2009, (Tr. 374), although the record herein only contains treatment records from June 2012 forward. (Tr. 393, 499). Jordon relies upon Dr. Moffett's records, of which there are nearly 50 pages of appointment notes, and his opinions submitted to the Commissioner in mid-December 2013, April 21, 2014, and August 11, 2015, to support her disability claim. (Tr. 374-75, 421-22, and 499-503.)

Dr. Moffett's notes reflect Jordon attended 12 appointments from June 2012 to November 2013. (Tr. 378-393). Each note is recorded on a form that contains a space for substantive comments and assessments. The form includes a section to assess "mental status" in which the provider can check boxes identifying the patient's appearance, affect, mood sensorium, memory, thought content, thought process and judgment. While Dr. Moffett's handwritten notes on the

---

[3] Jordon does not asset error related to the weight afforded to this treating physician.

forms are nearly illegible, his mental status assessments of Jordon at each appointment are clear from the boxes checked. He routinely indicated Jordon had a normal appearance, appropriate affect, euthymic mood, intact sensorium and memory, unremarkable thought content, linear through process and normal judgment. (Tr. 378-393).[4]

Dr. Moffett prepared an opinion for this claim in December 2013 in which he diagnosed Jordon as having major depression and anxiety. He noted Jordan had been a patient since March 2009, but that she had not improved with treatment. (Tr. 374). Dr. Moffett noted Jordan had moderate impairments in memory, concentration, and social ability. (Tr. 421). He also felt she could not remember and carry out simple instructions, maintain a work routine without frequent breaks for stress related reasons or inordinate supervision, respond appropriately to normal stress and routine changes, or maintain a work schedule without missing frequently due to psychological issues. (Tr. 422). He noted she was expressing suicidal thoughts and, despite not marking that substance abuse was an ongoing issue, noted it was a "primary" problem. (Tr. 421). This opinion is markedly inconsistent with Dr. Moffett's mental status assessments.

Jordon attended three appointments from December 2013 through March 2014 ahead of Dr. Moffett issuing a second report. (Tr. 425-27, 428). As with the earlier notes, the mental assessments were consistently normal with the exception of a single March 2014 notation that intermediate memory was impaired. (Tr. 425).

Dr. Moffett's second report, dated April 21, 2014, again reflects the diagnosis of major depression and anxiety disorder and a lack of improvement with treatment. (Tr. 421). He lists

---

[4] In the year and a half preceding his first report, Dr. Moffett twice failed to fully assess mental status. (Tr. 384). On one occasion, he noted Jordan was depressed and he once observed a blunted affect (Tr. 380). On three occasions in this year and a half from mid-2012 to December 2013, he found her to be anxious (Tr. 380, 388, 390.) These notations were outliers; the vast bulk of assessments reflected a normal mental status.

9

several medications prescribed to Jordon, with the remainder of the opinions being the same as the 2013 report. This opinion is inconsistent with the historic mental status assessments.

Jordan attended 12 more sessions with Dr. Moffett from May 2014 to June 2015 prior to his issuance of a third opinion that included a Mental Residual Functional Capacity Assessment and a Medical Listing Inquiry on August 11, 2015. (Tr. 499). (This opinion was prepared several days *after* the August 3, 2015, hearing with the ALJ.) With the exception of two notes indicating Jordon had a blunted affect, (Tr. 434, 437), Dr. Moffett routinely recorded a normal mental status assessment in this 13 month period. (Tr. 432-44).

In stark contrast, Dr. Moffett's August 2015 opinion describes a patient with a poor prognosis and whose limitations in understanding, memory, sustained concentration, persistence are predominately categorized as "marked" or "extreme" as compared to being considered "moderate" in the two prior reports. His opinion is not only inconsistent with the normal mental status assessments contained in the vast majority of the appointment notes and the prior opinions submitted on Jordon's behalf, but it is also internally inconsistent. For example, Dr. Moffett assessed five areas of social interaction in the residual function capacity assessment. Of the five, he marked "none" in response to inquiries about three social interaction abilities and "mild"[5] for the remaining two. (Tr. 501). However, in the medical listing inquiry form, Dr. Moffett was asked to address whether Jordon has "marked difficulties in maintaining social function." Despite the "none" and "mild" responses in the residual functional capacity form completed contemporaneously with the medical listing form, Dr. Moffett indicated that Jordan has "marked

---

[5] "Mild" fell within a range of categories of increasing severity as follows: none, mild, moderate, marked, extreme. "Mild" was defined on the form as reflecting that "there are limitations on ability to function but they are mild or transient." A "marked" limitation was defined as "the ability to function in this area is seriously limited." (Tr. 500).

difficulties in social functioning." (Tr. 503). This glaring discrepancy is unexplained.

In addition to Dr. Moffett, two state agency reviewers addressed Jordon's mental impairments. On January 24, 2014, George Davis, Ph.D, opined that Jordon has major depressive disorder and anxiety that he categorized as severe. (Tr. 50). Dr. Davis indicated the impairments moderately limit Jordon's ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual, and interact with the general public. (Tr. 51,53). Dr. Davis believed the two impairments were severe. He did not address the myriad normal mental status assessments in Dr. Moffett's records.

On May 21, 2014, Jeffrey Wright, Ph.D., issued an opinion. He concurred with the diagnoses identified by Drs. Moffett and Davis and also categorized the impairments as severe, but acknowledged that Dr. Moffett's opinion reports were not supported by his own records. (Tr. 65-67). Dr. Wright adopted the same moderate limitations listed by Dr. Davis. (Tr. 68-69).

The ALJ ultimately found that Dr. Moffet's opinions were not supported by the record evidence, including his own treatment documents reflecting normal mental status evaluations. (Tr. 15, 16, 18). The ALJ also relied upon Jordon's various activities in forming this conclusion. (*Id.*) Little weight was afforded to Dr. Moffett's opinion. (Tr. 18). For comparable reasons, the ALJ also afforded little weight to the opinions of the state agency evaluators. [6]

The Court agrees with the weight afforded to the opinions of Dr. Moffett and the state

---

[6] The ALJ noted with regard to each medical expert opinion that Jordon's mental impairments symptoms were "well-controlled with medication, resulting in essentially normal mental status evaluations." (Tr. 18). However, the record does not specifically reflect that the normal mental status evaluations were the result of Jordon's pharmaceutical treatment. The ALJ can only infer the existence of a causal relationship. To the extent this inference could be considered error, the error is harmless as it does not alter the existence of a multitude of normal mental status evaluations. The Court also observes that such inference is also not unreasonable in light of the treatment records.

agency reviewers. As previously discussed, Moffett's three opinions are inconsistent with his own assessments. Although the timing of Dr. Moffett's third opinion was not questioned by the ALJ, the Court has doubts about such timing. The opinion was prepared and submitted over a week after the hearing in which Jordon admitted she would accept full-time employment. It seems the report was submitted in an effort to rehabilitate Jordon's claim after she discredited herself with testimony that surprised her counsel and prompted the ALJ to ask why the hearing was occurring.[7] The state evaluator's opinions are similarly flawed as they fail to account for the normal assessments. In short, substantial evidence supports the ALJ's determinations as to the weight afforded to the medical opinions.

The ALJ did not conclude his analysis as to the severity of Jordon's mental impairments with findings relative to the opinion evidence. Rather, he proceeded to review the global assessment of function ("GAF") rating and analyze why the rating did not support severity. While this analysis supports the lack of severity, the analysis is effectively unnecessary given the Sixth Circuit's holdings that GAF scores are subjective, have "little bearing on the individual's ability to function in an occupational context," and ALJ's "need not put 'stock' in them." *See Edwards v. Astrue,* 2009 WL 976473 at *7 (W.D. Ky. 2009) (citing *DeBoard v. Comm'r of Soc. Sec.,* 211 F.App'x 411, 2006 WL 3690637 (6th Cir. 2006), *Kornecky v. Comm'r of Soc. Sec.,* 167 F.App'x 496, 2006 WL 305648 (6th Cir. 2006).

The ALJ next considered the four functional areas identified in Section 12.00(c) of the Listing of Impairments at 20 C.F.R., Part 404, Subpart P, Appendix 1. This section governs

---

[7] Counsel attempted to elicit rehabilitative testimony, including asking Jordon about her job duties as a part-time health screener and advising the ALJ that Jordon's earnings did not meet the standard for substantial gainful employment. (Tr. 29-30). After the ALJ expressed skepticism about the claim and her counsel questioned her about the job, Jordon claimed that she has not been able to work full time and retreated to the position that she would only try to work full-time. (Tr. 30).

assessment of severity of mental impairments and focuses on activities of daily living, social functioning, concentration, persistence or pace, and episodes of decompensation.

The ALJ first found a mild restriction in activities of daily living as Jordon was able to initiate and participate in a range of activities without supervision or direction. (Tr. 18). The Court concurs as more specifically noted in the discussion of Jordon's specific activities.

The ALJ then found that Jordon has mild difficulty in social functioning because she was able to initiate social contacts, communicate clearly, participate in group activities and demonstrate cooperative behaviors with little difficulty. (Tr. 18). The Court again concurs based upon the record and evidence of various social activities that contrast with assertions that Jordan has anxiety in public. Further, Jordon's ongoing employment as a health screener reveals an absence of a social impairment since she must routinely interact with the public and address personal matters regarding patient health.

The ALJ next found Jordon has mild difficulties with concentration, persistence or pace. The ALJ explained that Jordon can sustain focused attention and concentration long enough to allow for timely and appropriate completion of tasks commonly found in routine, repetitive, and detailed/complex, work settings. (Tr. 19). While the ALJ's basis for this finding is not particularly illuminating, the record contains ample evidence to support the finding. Jordon works part-time for five hour shifts and must obtain and accurately record health screening data. (Tr. 33). Among other things, she has traveled for her job, does crafts and makes jewelry, reads, and prepares meals, all of which require concentration, persistence and pace. (Tr. 35-6, 166, 195-99, 218).

Lastly, the ALJ noted Jordon has experienced no episodes of decompensation of extended duration and that the records lacked evidence of significant, sustained loss of adaptive functioning. (Tr. 19). The Court's review of the record confirms this finding.

13

In light of the foregoing, the Court finds substantial evidence exists to support the ALJ's determination that Jordon's mental impairments are not severe.

**B.   Evaluation of Fibromyalgia**

Fibromyalgia is a condition that *may* result in a disability determination, but a diagnosis "does not equate to a finding of disability or an entitlement to benefits." *Stankoski v. Astrue*, 532 F.App'x 614, 619 (6th Cir. 2013) (citing *Vance v. Comm'r of Soc. Sec.*, 260 F.App'x 801, 806 (6th Cir. 2008). SSR 12-2p describes the criteria for establishing when "a person has a medically determinable impairment ("MDI") of fibromyalgia, … the sources of evidence the ALJ may look to, … and how a claimant's subjective assertions of pain and functional limitations are evaluated." *Luukkonen v. Comm'r of Soc. Sec.*, 653 F. App'x 393, 398 (6th Cir. 2016). SSR 12-2p explains that fibromyalgia is a "complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." *See* 2012 WL 3104869 at *2 (2012). The ruling introduction provides:

> When a person seeks disability benefits due in whole or in part to [fibromyalgia], we must properly consider the person's symptoms when we decide whether the person has an MDI[8] of [fibromyalgia]. As with any claim for disability benefits, before we find that a person with an MDI of [fibromyalgia] is disabled, we must ensure there is sufficient objective evidence to support a finding that the person's impairment(s) so limits the person's functional abilities that it precludes him or her from performing any substantial gainful activity.

*Id.* Sections I and II address the process of evaluation.

Per Section I, fibromyalgia can be established by providing evidence from an acceptable medical source, i.e. a licensed physician. *Id.* However, a diagnosis alone is insufficient. Rather, the evidence "must document that the physician reviewed the person's medical history and conducted a physical exam." *Id.* Likewise, the treatment notes should be consistent with the

---

[8] Medical determinable impairment.

14

diagnosis, reflect status of symptoms and establish the assessment over time of strength and functional abilities. *Id.*

Next, Section II addresses the evaluation process for determining whether an MDI of fibromyalgia exists. *Id.* A medically determinable impairment of fibromyalgia exists "if the physician diagnosed [fibromyalgia] and provides the evidence described in section II.A or section II.B, and the physician's diagnosis is not inconsistent with the other evidence in the person's case record." *Id.* Under Section II.A., the Commissioner relies upon the 1990 Criteria for the Classification of Fibromyalgia to determine whether the person has (1) a history of widespread pain, (2) at least 11 positive tender points bilaterally above and below the waist on examination, and (3) evidence that other disorders that could cause the symptoms or signs were excluded. *Id.* at *2-3. Under Section II.B., fibromyalgia may be found if the person has (1) a history of widespread pain, (2) repeated manifestations of six or more fibromyalgia signs, symptoms or co-occurring conditions, and (3) evidence that other disorders that could cause these manifestations were excluded. *Id.* at 3.

Jordan asserts the ALJ erred in failing to find that she has the medically determinable impairment and disabling condition of fibromyalgia. [Doc. 14, p. 19]. While the ALJ noted that Jordon has "history of fibromyalgia prior to 2008, but no evidence of trigger point pain or tenderness to palpation on prior or current examinations," he found that the medically determinable impairment of fibromyalgia was not established. (Tr. 17). Jordon believes this is the result of a failure to properly evaluate and address the evidence in accordance with SSR 12-2p. She also points to medical records in which fibromyalgia is addressed, attaches a variety of records not contained in the Commissioner's record and references various instances in the medical records addressing complaints, including pain, weakness and numbness in her limbs and muscles.

A number of records indicate Jordan has fibromyalgia. However, a close review of the records reveals no diagnosis of fibromyalgia by the physicians whose records have been provided. The records are devoid of discussion as to why the condition is listed, who diagnosed the condition or when or why it was diagnosed. The same is true of the remaining records not specifically cited *and* the records she filed in an effort to supplement the record.[9] Fibromyalgia simply appearing on records without more or Plaintiff reporting she has the condition does not constitute a diagnosis as required by Section I of SSR 12-2p.

Even if the Court assumes Jordon was diagnosed with fibromyalgia, Section II.A. or II.B. must still be satisfied. Jordon's medical records indicate she has widespread pain; she also testified to this. Thus, the first criteria of both sections is satisfied. With regard to the remaining two factors of Section II.A., the medical information contains no indication a physician conducted a physical examination of tender points as described in Section II.A. Further, there is no evidence that other disorders were excluded despite Jordon pointing the Court to several tests that she claims were exclusionary. The cited degenerative disc disease x-ray report cannot be relied upon as it is not part of the Commissioner's records. [Doc. 14-1, p. 16; ID 519]. Even if the Court relied on the records, there is no indication that the x-ray was obtained to rule out fibromyalgia. Rather, it appears to have been ordered to investigate complaints of acute low back pain. The report lists a clinical indication of sacroiliitis and makes no reference to fibromyalgia. (*Id*.). The bone density study specifies that it is a postmenopausal test. (Tr. 244). The EMG test makes no reference to fibromyalgia and the test results were normal. (Tr. 369).

---

[9] The Court cannot rely upon records submitted after the Decision for purposes of a substantial evidence review. *Foster v. Halter*, 279 F.3d. 348 (6th Cir. 2001). Nonetheless, the Court has reviewed the records Jordon submitted. They are of no consequence as they do not contain a diagnosis of fibromyalgia or the information mandated by SSR 12-2p Section II. [Doc. 14-1].

With regard to the remaining Section II.B. factors, the records show Jordan manifests some fibromyalgia symptoms, signs or co-occurring conditions. But, the total number is unclear and no physician relates these signs, symptoms or co-occurring conditions to fibromyalgia.

With regard to the third criteria, the Court has reviewed no record evidence to indicate other disorders that could cause these manifestations were excluded as more fully discussed above regarding Section II.A.

While the ALJ's explanation of his final determination that Jordan does not have the medically determinable impairment of fibromyalgia is terse, it is apparent from the Decision that the ALJ made a thorough review of the history and information on this topic in reaching his conclusion. (Tr. 18). The determination, despite its brevity, is supported by substantial evidence.

## IV. CONCLUSION

Based upon the foregoing, the Court finds substantial evidence exists to support the ALJ's decision. Accordingly, the court RECOMMENDS that Plaintiff's motion for judgment on the pleadings [Doc. 13] be DENIED and the Commissioner's motion for summary judgment [Doc. 15] be GRANTED for the reasons stated herein. [10]

SO ORDERED:

s/ Clifton L. Corker
UNITED STATES MAGISTRATE JUDGE

---

[10] Objections to this Report and Recommendation must be filed within 14 days after service of this recommended disposition on the objecting party. 28 U.S.C. 636(b)(1); Fed. R. Civ. P. 72(b)(2). Such objections must conform to the requirements of Rule 72(b), Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).